IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ERIN LEA BARNETT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:20-cv-00663 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ROANOKE COUNTY SCHOOL | ) | By:   Hon. Thomas T. Cullen |
| BOARD, | ) |       United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Erin Barnett, the Supervisor for Science for Roanoke County Public Schools ("RCPS"), sued Defendant Roanoke County School Board ("Defendant" or "the School Board") for paying her a lower salary than it paid a male colleague who held a similar administrative position. According to Barnett, the School Board paid her less because she is a woman and therefore discriminated against her in violation of Title VII of the Civil Rights Act. The School Board moved for summary judgment, and that motion is now ripe for decision. Because Barnett has presented sufficient evidence from which a reasonable jury could infer that the difference in pay was the result of sex discrimination, the court will deny summary judgment.

## I.   BACKGROUND

Barnett is currently the Supervisor for Science for RCPS. The school system hired her as a science teacher on August 14, 2006, and she held that position until July 1, 2018, when she started her current administrative role. As a teacher, Barnett regularly taught summer

school and virtual classes through RCPSOnline Academy,[1] for which she received a stipend. By all accounts, Barnett was an excellent teacher.  In 2014, she assumed the role of chair of the science department at Cave Spring High School, for which she received an additional stipend.

In May 2018, Barnett applied for the open position of Supervisor of Science through RCPS's online hiring portal.  The job description for the position provided that the Supervisor of Science "supervises the K–12 science program, science teachers, and the Center for Engineering as part of the Governors STEM Academy at Burton Center of Arts and Technology." (ECF No. 32-7.) In other words, the Supervisor of Science would oversee the science curricula and science teachers across all of RCPS's elementary, middle, and high schools.  The job description, which is analyzed in more detail below, also listed numerous other duties, objectives, and responsibilities related to implementing and supervising science instruction at RCPS.  The Supervisor of Science would also be responsible for coordinating science fairs across the school division.   According to the written job description, the Supervisor of Science position required a collegiate professional teaching license with an endorsement in science, a master's degree,[2] and experience teaching at the secondary level. Based on her 13 years of experience teaching at RCPS, her educational background (holding

---

[1] RCPSOnline Academy is an online program that allows RCPS students to take classes in a variety of subject areas.  *RCPSOnline Acad.*, http://rcps.us/academy (last visited Nov. 19, 2021).  The classes are self-paced and students access course content through a learning-management platform.  *See id.*  The program provides students with additional options to deal with scheduling conflicts, limited in-person course availability, and medical issues, as well as the opportunity to broaden their learning experience.  *See id.*

[2] The job description used as an exhibit during depositions in this case lists "Master's Degree" as a requirement for this position.  (ECF No. 32-7, at 2.)  But the record also includes a job description that lists a master's degree as "preferred."  (ECF No. 31-3, at 7.)

two master's degrees), and her Virginia teaching license with a science endorsement, Barnett was abundantly qualified for this supervisory position. She applied and was one of approximately five candidates selected for interviews out of a larger applicant pool. (Decl. of James Bradshaw ¶ 9, Sept. 10, 2021 [ECF No. 31-3].)

James Bradshaw, RCPS's Director of Human Resources, and other RCPS administrators conducted the first round of interviews. Bradshaw rated Barnett as "a top candidate" for the position. (*Id.* ¶ 10.) Based on her performance in the first round, RCPS invited Barnett to a second round of interviews. Barnett was "selected as the first choice by a majority of the interview committee," and she was recommended to the School Board for the position. (*Id.* ¶ 12–13.)

As Director of Human Resources, Bradshaw was responsible for setting Barnett's new salary in accordance with RCPS's pay plan. This plan, which was approved and periodically updated by the School Board, consists of numbered Grades and corresponding letter Steps. Bradshaw assigns Grades based on the specific job classification (i.e., Teacher, Athletic Director, Supervisor of Art, etc.), and Steps "primarily by years of experience." (*Id.* ¶ 14.) Per policy, the Supervisor of Science position, like all instructional supervisors, is assigned to Grade 24 of the scale for non-teaching positions. (*See* ECF No. 31-3, at 16–17.) Based on Barnett's 13 years of teaching experience at the time of her promotion, Bradshaw initially placed her on Step D, yielding a salary of $59,464.51.

When Bradshaw informed Barnett what her new salary would be, she expressed concern that it was less than she currently made as a teacher, factoring in the stipends she received for chairing the high-school science department and regularly teaching online and

summer school courses.  (Dep. of Erin Barnett 26:19–28:6, Aug. 18, 2021 [ECF No. 32-3].)

She asked Bradshaw if she could continue teaching RCPSOnline Academy classes to make up

for this reduction in salary.  Bradshaw, in turn, consulted the Supervisor of English and

RCPSOnline Academy, Joe LeGault, who informed Bradshaw that Barnett could not continue

to teach these virtual classes because it would present a conflict of interest.[3]  Bradshaw, in

turn, informed Barnett that she would not be able to continue teaching RCPSOnline Academy

courses as the Supervisor of Science.  After some additional discussion, Bradshaw decided to

advance Barnett one Step on the scale—to Step E—to account for the fact that she would be

losing her $867 department-chair stipend as part of the promotion.  This resulted in an

adjusted salary of $60,851.90.  Bradshaw told Barnett that he could not go any higher, so

Barnett accepted the position at Step E, signing a contract to work 8 hours per day,[4] 240 days

per year.  (*See* Barnett Dep. at 27:14–20.)  Accordingly, on June 12, 2018, the School Board

approved her promotion to Supervisor of Science, a role that she formally started on July 1,

2018.

---

[3] As LeGault later explained it, the conflict arises because a content-area supervisor, like the Supervisor of Science, is responsible for selecting instructors to teach RCPSOnline Academy science courses and for adjudicating any complaints or issues about the courses.  (Decl. of Joe LeGault ¶ 6, Sept. 9, 2021 [ECF No. 31-5].)  In other words, RCPS would not put Barnett in the untenable position of deciding whether to hire herself to teach extra classes or fielding complaints about her own conduct as an online teacher.  Barnett argues that RCPS manufactured this purported conflict of interest, citing the fact that RCPS's Supervisor of Art, Sara Cubberly, teaches an online course.  As it turns out, Cubberly does not teach for the Online Academy, but for a separate RCPS entity, the Governor's STEM Academy at Burton Center for Arts and Technology, a more selective program for high-achieving students who are interested in taking advanced courses.  (Second Decl. of Jessica McClung ¶ 9–14, Sept. 21, 2021 [ECF No. 33-1].)  Importantly, Cubberly does not select the art instructors for the Burton Center or have any supervisory responsibilities there; thus, unlike Barnett, Cubberly's responsibilities as the Supervisor of Art do not conflict with her role as an online instructor at the Burton Center.  (*See id.* ¶ 13.)

[4] Barnett's contract hours were reduced to 7.5 hours per day, effective July 1, 2021.

In mid-June of the same year, RCPS learned that it would need to hire a new Supervisor of Health, Physical Education, and Driver Education.  The timing of this vacancy was surprising, as the then-Supervisor, who had previously announced his intent to retire at the end of the following school year, moved up his retirement date to the summer.  According to RCPS, the timing was also problematic because mid-June is considered "very late" in the hiring season, as most potential candidates have already committed to other positions for the upcoming school year.  (Bradshaw Decl. ¶ 24; Decl. of Rebecca Eastwood ¶ 10, Sept. 9, 2021 [ECF No. 31-6].)

RCPS posted this vacancy on its online hiring portal on June 18, 2018, and it remained open for seven days.  (Bradshaw Decl. ¶ 23.)  The job description for this position stated that the Supervisor of Health, Physical Education, and Driver Education "is responsible for the development, maintenance and revision of the K–12 health and physical education curriculum that includes family life and driver education; the se[le]ction and revision of instructional materials to support the curriculum; and teacher support and professional development." (ECF No. 32-8.)  Like the Supervisor of Science does for the science program, the Supervisor of Health, Physical Education, and Driver Education oversees the health and physical education curricula and teachers of that subject matter across all of RCPS's elementary, middle, and high schools.   And, as discussed below, its additional job duties, objectives, and responsibilities are virtually identical to those of the Supervisor of Science.  The Supervisor of Health, Physical Education, and Driver Education also conducts driver's safety nights, which take place outside of regular hours. The position required a collegiate professional teaching license with endorsements in K–12 Health and Physical Education and Driver Education, but

not a master's degree.[5]  This position also required experience teaching at either the elementary or secondary level.

After an initial round of interviews, the hiring committee selected two RCPS teachers, Kevin Burcham and Jason Murray, as the top two candidates.  Murray, however, withdrew himself from consideration for personal reasons.  RCPS asserts that Murray's withdrawal increased the pressure to land Burcham for the role, given the fast-approaching school year and the fact that only a limited number of otherwise-qualified physical education and health supervisory candidates also possessed the required additional endorsement in driver's education.  Bradshaw, who was also responsible for setting Burcham's salary, explained that he "understood that it was exceedingly important to the school division to ensure that Burcham accepted the position." (Bradshaw Decl. ¶ 30.)  Bradshaw added that during his and the interview panel's discussions with Burcham about the new role, Burcham indicated that RCPS would have to compensate him for the coaching stipend he would have to give up. (Dep. of James Bradshaw 19:13–23, July 15, 2021 [ECF No. 32-5]; Bradshaw Decl. ¶ 29.)

Like the Supervisor of Science, the Supervisor of Health, Physical Education, and Driver Education is paid on Grade 24.  (*See* ECF No. 31-3, at 16.)  Bradshaw initially assigned Burcham to Step F, to account for his 14 years of teaching experience (one more than Barnett, whom he had assigned to Step E)[6].  But Bradshaw advanced Burcham four additional steps,

---

[5] The job description indicated that a master's degree is only "preferred" for this position.  (ECF No. 32-8.) Kevin Burcham, who was selected for the position, holds a master's degree.  (Dep. of Kevin Burcham 8:3–17, July 27, 2021 [ECF No. 32-2].)

[6] Notably, Bradshaw originally assigned Barnett to Step D based on her 13 years of teaching experience and moved her an extra step to account for her lost Department Chair stipend. Presumably, this would have placed Burcham at Step E originally, based on his 14 years of experience, but that is not the explanation Bradshaw provided.  (*See* Bradshaw Decl. ¶ 16–17, 31–32.)

to Step J, to account for the $4000 coaching stipend he would have to give up (each additional step being worth approximately $1000 in additional compensation). Burcham accepted the position on these terms, signing a contract to work 8 hours per day,[7] 220 days per year. Burcham's starting salary was $62,606.84.

Given Burcham's salary and contract hours, RCPS paid him $284.55 per day during the 2018–2019 school year. Based on Barnett's salary and contract hours, RCPS paid her $258.45 per day. Sometime in the spring of 2019, Barnett became aware that Burcham, who as a fellow instructional supervisor works on the same hallway in RCPS's administration building (and whom she considers a friend), had a higher salary than she did. Barnett contacted the Human Resources department about her concerns and later met with Bradshaw. According to Barnett, during her meeting with Bradshaw, she specifically pointed to Burcham's higher salary in support of her complaint about her own salary. (Barnett Dep. at 43:9–21.) Bradshaw, however, testified that although Barnett expressed concerns about her salary—specifically asking him to confirm that she was on the correct step and asking if her salary could be increased—she did not mention Burcham's salary or the salaries of any other employees. (Bradshaw Decl. ¶ 33.) After reviewing the matter, Bradshaw emailed Barnett two days later to confirm that he could not change her salary. Barnett responded by email, thanking Bradshaw "for looking into the matter." (Barnett Dep. at 45:1–5.)

During the relevant time, the School Board had in effect a policy prohibiting discrimination based on sex. (First Decl. of Jessica McClung ¶ 3, Sept. 9, 2021 [ECF No. 31-

---

[7] Burcham's contract hours were reduced to 7.5 hours per day, effective July 1, 2019.

1]; *see* ECF No. 31-1, at 3–7.)  Barnett never filed a complaint of discrimination with RCPS. (First McClung Decl. ¶ 7.)  But approximately eight months later, on December 31, 2019, Barnett filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and later received a right-to-sue letter.  She then filed a complaint in this court alleging a single count of sex discrimination in violation of Title VII.  RCPS filed a motion to dismiss Barnett's complaint, arguing that she had failed to state a plausible claim of sex discrimination based on a comparison to Burcham.  (*See* ECF No. 4.)  The court denied the motion to dismiss, and the parties proceeded to discovery.  On September 10, 2021, RCPS filed the instant motion for summary judgment.  Barnett filed a response in opposition, and RCPS filed a reply.  The court has reviewed the pleadings, the voluminous factual record, and the arguments of the parties as set forth in its summary-judgment briefs.  Oral argument is not necessary as the facts and legal arguments are adequately presented in the written filings, and additional argument would not aid the court in deciding the issues before it.

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013).  When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties.  *Celotex*, 477 U.S. at 322.  Whether a fact is material depends on the relevant substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

### III.   ANALYSIS

#### A.   Title VII: Pay Discrimination

Barnett brings her sex-discrimination claim under Title VII, claiming that she received unequal pay as compared to Burcham, a male employee who she contends is essentially

performing the same work.  Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).  When a plaintiff does not have direct evidence of discriminatory motive, courts apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017).  The parties agree that this matter falls under the *McDonnell Douglas* burden-shifting scheme.

Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of sex discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  For a disparate treatment claim, the plaintiff must initially show that "(1) she is a member of a protected class, (2) she was performing her job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive."  *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019).  The plaintiff must establish this *prima facie* case by a preponderance of the evidence.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).  If she succeeds, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to put forward a legitimate, non-discriminatory reason for its adverse employment action.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). "If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted."  *Tx. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981).  At that point, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,

510–11 (1993).  The burden returns to the plaintiff to establish, by a preponderance of the evidence, that the purported legitimate reasons cited by the employer are pretextual—"that the [employer's] proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination."  *Burdine*, 450 U.S. at 256. Stated differently, the plaintiff, in satisfying her pretext burden under the third prong of the *McDonnell-Douglas* test, must establish that the defendant's reason is false *and* that discrimination is the actual reason.  *See Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (emphasis added).

### 1. *Prima Facie* Case of Intentional Discrimination

In this case, the School Board does not dispute that Barnett can satisfy the first three elements of her *prima facie* case, nor can it.  It is undisputed (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; and (3) that her job performance was satisfactory.  Indeed, courts have long held that "[d]isparate pay is an adverse employment action under Title VII."  *Horton v. Walmart, Inc.*, No. 5:20cv107, 2021 WL 3013365, at *4 (W.D. Va. July 16, 2021) (quoting *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1364 (11th Cir. 2018)).  The School Board, however, contends that Barnett can't satisfy the fourth element—that the adverse employment action occurred under circumstances that permit an inference of intentional discrimination.

As a general matter, a plaintiff seeking to establish an inference of intentional discrimination can do so by showing that "similarly-situated employees outside of [her] protected class received more favorable treatment."  *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).  When a plaintiff relies on a comparator to show a *prima facie* case of

discrimination, the comparator must be similarly situated "in all relevant respects . . . ." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010).  For this inquiry, courts consider whether the employees had the same job description and were subject to the same standards; whether they had comparable experience, education, qualifications, and performance; and whether they had the same supervisor(s). *See Spencer*, 919 F.3d at 207; *see also David v. Winchester Med. Ctr.*, No. 5:16cv63, 2018 WL 310140, at *12 (W.D. Va. Jan. 5, 2018) ("Because [the plaintiff] and [the comparator, Dr. Restrepo] did not report to the same individual, as a matter of law, Dr. Restrepo cannot serve as a comparator.").  Ultimately, "[a]n employee need not show complete identity in comparing [herself] to the better treated employee, but [she] must show substantial similarity." *Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 589 (D. Md. 2009). If the two employees are similar in all relevant respects but have different pay, then an inference arises that the pay differential stems from discriminatory treatment. *See Swaso*, 698 F. App'x at 748.

Barnett contends that she and Burcham are similarly situated in all relevant respects. She argues that they performed the same work and have virtually identical job descriptions. Her job description provided:

**Responsibilities/Duties/Functions/Tasks**:

- Communicates with staff, administration, school board, and community
- Supervises the development and revision of curriculum and assessments
- Supervises classroom instruction to assess level of curriculum implementation
- Plans and leads staff development activities
- Monitors regional, state, and national curriculum trends through participation in professional conferences and organizations
- Supervises the purchase, use, and safety of instructional materials, equipment, and facilities
- Recruits, interviews, and makes recommendations for employment and placement
- Meets regularly with the instruction department, administration, and science teachers

(Supervisor of Science Job Description [ECF No. 32-7].)  Burcham's provided:

**Responsibilities/Duties/Functions/Tasks**:

- Communicates with staff, administration, school board, and community

- Supervises the development and revision of curriculum and assessments

- Supervises classroom instruction to assess level of curriculum implementation

- Plans and leads staff development activities

- Monitors regional, state, and national curriculum trends through participation in professional conferences and organizations

- Supervises the purchase, use, and safety of instructional materials, equipment, and facilities

- Recruits, interviews, and makes recommendations for employment and placement

- Meets regularly with the instruction department, administration, and health and physical education teachers

(Supervisor of Health, Physical Education and Driver Education Job Description [ECF No. 32-8].)  And Barnett correctly points out that these supervisor positions held identical minimum eligibility requirements or qualifications.  The Supervisor of Science position required:

**Minimum Job Requirements/Qualifications**:

Be able to perform multiple, highly complex technical tasks with a need to periodically upgrade skills in order to meet changing job conditions; Be able to communicate effectively to implement desired actions; Be flexible to independently or collaboratively work with others in a wide variety of circumstances; Be able to analyze data and reports to help determine the staffing needs within the division; Be able to establish professional relationships and communicate effectively with administration, faculty, and parents; Be able to set priorities and meet deadlines; Strong computer skills with proficiency in Microsoft Office (Word, Excel, PowerPoint and Outlook)

(Supervisor of Science Job Description [ECF No. 32-7].)  The Health, Physical Education and Driver Education position required:

**Minimum Job Requirements/Qualifications:**

Be able to perform multiple, highly complex technical tasks with a need to periodically upgrade skills in order to meet changing job conditions; Be able to communicate effectively to implement desired actions; Be flexible to independently or collaboratively work with others in a wide variety of circumstances; Be able to analyze data and reports to help determine the staffing needs within the division; Be able to establish professional relationships and communicate effectively with administration, faculty, and parents; Be able to set priorities and meet deadlines; Strong computer skills with proficiency in Microsoft Office (Word, Excel, PowerPoint and Outlook)

(Supervisor of Health, Physical Education and Driver Education Job Description [ECF No. 32-8].)   Importantly, Barnett notes that both she and Burcham testified that the above descriptions accurately reflect their day-to-day responsibilities as the Supervisor of Science and Supervisor of Health, Physical Education, and Driver Education.   (*See* Barnett Dep. at 110:5–15; Burcham Dep. at 37:20–39:6.)   As Burcham succinctly put it, "No, I think I do all of those things."   (Burcham Dep. at 38:5.)

Burcham also points out that all instructional supervisors work together in the RCPS administration building, attend the same monthly meetings, are grouped together on RCPS's organizational chart, and report to the same supervisors, who are one step above them in the RCPS' chain-of-command, as illustrated here:



(ECF No. 32-9.)  Finally, Barnett notes that the Instructional Supervisors regularly collaborate and share ideas on how to fulfill their common job duties.  (Barnett Dep. at 114:22–118:1.)

The School Board pushes back on these abundant similarities, arguing that there are several material differences in Barnett's and Burcham's general duties and day-to-day responsibilities, such that she is not similarly situated with him in all relevant respects.  First, the School Board makes the obvious point that they supervise vastly different subject areas. Second, it contends that the qualifications for the two positions are different.  A Supervisor

of Science must hold a master's degree and a Virginia teacher's license with a single endorsement in science, while RCPS only *prefers* that the Supervisor of Health, Physical Education, and Driver Education hold a master's degree and requires *two* license endorsements: physical education and driver's education.[8]  The School Board also points out that Barnett's position requires teaching experience at the secondary level, while Burcham's requires experience either at the secondary or elementary level.  Finally, Defendant notes that the positions involve different extracurricular responsibilities.  Barnett is responsible for coordinating science fairs across RCPS's divisions, while Burcham oversees driver safety nights at its high schools.

Highlighting these differences, the School Board points to the Fourth Circuit's recent decision in *Spencer v. Virginia State University* to argue that Barnett has failed to establish that the work that she and Burcham performed was sufficiently similar and therefore that he is not a proper comparator.  919 F.3d 199 (4th Cir. 2019).  In that case, the plaintiff, a sociology professor at VSU, sued the university under Title VII and the Equal Pay Act for paying her less than two male colleagues because of her sex.  *Id.* at 202.  As in this case, the plaintiff in *Spencer* did not have direct evidence of discriminatory motive and attempted to prove her case through the *McDonnell-Douglas* burden-shifting scheme, relying on a comparator analysis to establish her *prima facie* case.  *Id.* at 207.  The court held that the plaintiff's comparators, two male professors from different academic departments, were not proper comparators, and

---

[8] But as previously noted, there are two versions of the Supervisor of Science job description in the record. Although virtually identical, one of the descriptions provides that a master's degree is "preferred," while the other removes the word "preferred," implying that it is required.  *See supra* note 2.  As noted above, both Barnett and Burcham have master's degrees.

therefore that the plaintiff had failed to meet her burden of proof for either an Equal Pay Act or Title VII violation. *See id.* at 204, 207. In so doing, the court noted that although "Title VII requires compared jobs to be only 'similar' rather than 'equal,' as required under the Equal Pay Act," this similarity requirement "is not toothless." *Id.* at 207. Accordingly, a plaintiff who relies on a comparator "must provide evidence that the proposed comparators are not just similar in *some* respects, but 'similarly [] situated *in all respects.*'" *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)) (emphasis in original). The court concluded that the plaintiff had not met this burden since she had relied on "broad generalizations at a high level of abstraction" about college professors' similar tasks of "instructing students, tracking student progress, managing the classroom, providing feedback, and inputting grades." *Id.* at 204. The court further noted, "Professors are not interchangeable like widgets. Various considerations influence the hiring, promotion, and compensation of different professorial jobs." *Id.* The court cited a "litany of concrete differences" between the plaintiff and her male comparators, including that they taught in different academic departments and instructed different types of students (undergraduate versus graduate), which involved distinct skills and responsibilities. *Id.* at 204–05.

But the facts of this case are markedly different from those of *Spencer*. In holding Burcham up as a comparator, Barnett does not rely on "broad generalizations at a high level of abstraction." To the contrary, she points to a litany of identical job duties and responsibilities, as detailed in nearly identical job descriptions written by RCPS. Even so, the School Board argues that Barnett has not put forward sufficient evidence that she and Burcham actually shared all of these job duties, but that contention is belied by the record.

Both Barnett and Burcham testified that they perform these specific job duties as instructional supervisors.  (*See* Barnett Dep. at 110:5–15; Burcham Dep. at 37:20–39:6.)  The court notes that other witnesses, including Drs. Stegall and Eastwood, were more equivocal on this point, but the testimony from the individuals who actually fulfill the described duties is more than sufficient to create a genuine issue of material fact as to whether the Supervisor of Science and the Supervisor of Health, Physical Education, and Driver Education were similarly situated.

And the fact that Barnett and Burcham supervise different subject areas is not fatal to the comparator claim, as the subject-matter difference was in *Spencer*.  In *Spencer*, the plaintiff and her comparators were professors from different academic departments who were teaching different types of students.  Barnett and Burcham, on the other hand, are no longer teachers; they are administrators of equal rank who, in the light most favorable to the plaintiff, share virtually identical job duties and responsibilities, report to the same supervisors, and are held to the same performance standards.[9]  These core similarities substantially outweigh trivial distinctions in their respective job qualifications and duties, such as differences between overseeing science fairs and driver's education nights, or requiring versus preferring a master's degree.  In sum, Burcham is a proper comparator, and Barnett has established a *prima facie* case of discrimination.

### 2.  Legitimate, Nondiscriminatory Reasons

Since Barnett has established a *prima facie* case of discrimination, the burden shifts to

---

[9] Applying *Spencer*, the court might have reached a different conclusion if Barnett had brought a pay-disparity claim while serving as a high-school science teacher, using a male middle school health and physical education teacher as a comparator.  But those are not the facts of this case.  Indeed, if Burcham—or another RCPS instructional supervisor—is not a proper comparator for purposes of Barnett's Title VII claim, it is difficult to imagine who could be.

the School Board to offer a legitimate, nondiscriminatory reason for the pay disparity.  *See Hoyle*, 650 F.3d at 336.  Over the course of this litigation, the School Board has essentially proffered three reasons.  In its initial brief in support of its motion for summary judgment, the School Board cited the "sense of urgency" surrounding Burcham's hiring given the late timing of the vacancy and the impending start of the school year.  (*See* Eastwood Decl. ¶ 11; Bradshaw Decl. ¶ 28.)  According to Defendant, this sense of urgency was only heightened given that one of the two finalists for the position, Jason Murray, withdrew from consideration, leaving Burcham as the only viable candidate.  The School Board also noted that the requirement that the new supervisor possess a second endorsement in driver's education further limited its options (and increased the pressure on Bradshaw to land Burcham), since few qualified health and physical education instructor applicants possess both endorsements.  Thus, Bradshaw "understood that it was exceedingly important to the school division to ensure that Burcham accepted the position."  (Bradshaw Decl. ¶ 30.)  Second, the School Board proffered that Burcham "made known that he would consider taking the position only if he were to be compensated for giving up his $3900 coaching stipend."  (Def.'s Br. Supp. Mot. Summ. J. at 20 [ECF No. 31].)  In its Reply brief, the School Board cites a third reason for the decision: that "Mr. Burcham negotiated more effectively than [Plaintiff] at the time they applied for their respective positions."  (Def.'s Reply Br. at 11 [ECF No. 33].)

Defendant contends that these legitimate considerations, rather than any discriminatory motive or bias on the part of the School Board, account for the Step differential and the attendant difference in pay.  Accordingly, the School Board has put forward "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason

for the adverse action," putting the burden of persuasion back on Barnett to prove that these reasons are pretext for discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 509.

### 3. Pretext

Thus, to survive summary judgment, Barnett must establish a genuine issue of material fact that the School Board's proffered reasons for the difference in pay are pretext for intentional discrimination. Stated differently, Barnett must put forth sufficient evidence from which a reasonable jury could draw that conclusion. To satisfy that burden, Barnett must prove both that the reason was false (or unworthy of belief), and that a discriminatory motive is the actual reason for the pay difference. *See Adams*, 640 F.3d at 560; *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005). The plaintiff may prove the discrimination requirement circumstantially—"a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). Relatedly, the Fourth Circuit has long recognized that a plaintiff may prove falsity by showing "that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019) (citing *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001)). That is, "[a] plaintiff may demonstrate pretext by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Fordyce v. Prince George's Cnty. Md.*, 43 F. Supp. 3d 537, 550 (D. Md. 2014) (internal quotation and citation omitted). And "[o]nce

the plaintiff offers such circumstantial evidence, the case must be decided by the trier of fact and cannot be resolved on summary judgment." *Haynes,* 922 F.3d at 225.

Barnett argues that she has satisfied her burden to show pretext because the School Board's purported legitimate reasons for paying Barnett less than Burcham are "inconsistent with the record, and they contradict other reasons" provided by her employer. (Pl.'s Resp. Br. at 19 [ECF No. 32].) Barnett seizes upon what she perceives as material differences between Defendant's initial position statement to the EEOC regarding its legitimate reasons for paying Burcham a higher salary and different reasons proffered by the School Board during the subsequent litigation. Given these perceived inconsistencies, Barnett asserts that the School Board initially "lied" to the EEOC (or, by implication, that it is currently lying to this court).

In that EEOC response, the School Board, through its counsel, essentially proffered four reasons for the pay disparity. First, the School Board cited the fact that Burcham had "one more year of seniority" than Barnett (14 years, as compared to Barnett's 13). (ECF No. 32-1, at 6.) Second, the School Board asserted that Burcham had "more experience . . . with respect to extracurricular or after school activities," comparing his 15 years of basketball coaching experience to Barnett's four years of experience chairing the science department at Cave Spring High School. (*Id.*) According to Defendant, "Being head basketball coach requires a significantly greater time commitment than acting as department chairperson." (*Id.*) Third, the School Board claimed that Burcham "negotiated more effectively than [Barnett] at the time they applied for their respective positions." (*Id.*) According to the School Board, Burcham, unlike Barnett, "was specific in his demands in asking for a higher salary by pointing to the coaching stipend he would forego by accepting the position[.]" (*Id.*) The School Board

further asserted that, had Barnett informed it that she would have to forego a virtual teaching stipend when she accepted the Supervisor of Science position, it "would have considered that factor when setting her salary[,]" implying that Bradshaw had not known of this fact at the time he made his salary determination.  (*Id.*)  Fourth, the School Board informed the EEOC that "market factors also played a role in [its] decision to offer Mr. Burcham a higher starting salary."  (*Id.*)  In support of this assertion, the School Board essentially proffered the same explanation that it has in its summary-judgment briefing: that the time-crunch associated with filling the vacancy close to the start of the school year, the difficulty of finding additional candidates who possessed a second (driver's education) endorsement, and the last-minute withdrawal of the top candidate justified Bradshaw's decision to offer Burcham a higher salary.

After a careful review of the relevant filings in this court and to the EEOC, the court concludes that the School Board, with one exception described below, has mainly been consistent regarding the reasons for the pay disparity.  Across both forums, the School Board has justified Burcham's higher salary for three principal reasons: (1) that Burcham had an additional year of teaching experience; (2) that RCPS was under considerable pressure to hire Burcham, given the time constraints and the limited number of candidates who possessed the requisite second endorsement in driver's education, and therefore was more willing to award additional compensation for the loss of his coaching stipend; and (3) that Burcham was more effective in negotiating a higher salary than Barnett.   During the litigation, the School Board has effectively collapsed the third justification into the second—that the time pressures and limited number of applicants effectively gave Burcham leverage in the negotiations, which he adeptly exercised.  But Barnett is correct that the School Board has abandoned an additional

justification for the disparity that it initially proffered to the EEOC: that Barnett did not inform Bradshaw that she would lose a virtual teaching stipend, and that he would have taken that into consideration if he had known it.   Although that discrepancy is notable, and concerning, it does not create a genuine issue of material fact that the other reasons are pretextual.

Despite the School Board's consistent positions, the record contains conflicting and inconsistent evidence about those explanations for the difference in pay between Barnett and Burcham.  Even though Burcham had an additional year of teaching experience, Bradshaw testified that this only justified a one-step difference between Burcham and Barnett on the applicable salary scale.  Bradshaw, however, awarded Burcham *four additional steps* (and the equivalent of roughly $4000) before offering him the job.  The School Board's justification for the remaining 80 percent of the salary disparity is that Burcham more effectively negotiated with the leverage of being the only viable candidate with the requisite driver's education endorsement, under a fast-approaching deadline.  But as Barnett correctly points out, there is a legitimate factual dispute as to whether Burcham negotiated at all, and relatedly, whether Bradshaw and the School Board are being truthful in making this assertion.  At his deposition, Burcham answered questions on this issue, as follows:

> Q:    . . . When did you first understand or when did you first know what your salary would be?
>
> A:    It was probably a couple of days after I got the call.  I think the next day I called back and accepted the position, and a couple of days later I got a phone call from Jim Bradshaw saying that the contract would be coming through I think at that point.  It was probably a digital contract that you sign.  He called and told me what the salary would be, and that was it.

> Q:     Did you ever negotiate at all relating to your salary?
>
> A:     No.
>
> Q:     So it's fair to say that Mr. Bradshaw told you what your salary would be, and you generally accepted those terms. Is that fair to say?
>
> A:     Yeah.  There had been emails between the time that I interviewed and the time that I signed the contract, but as far as that day, I didn't negotiate anything number wise at that point.

(Burcham Dep. at 19:13–20.)

The School Board argues that this testimony does not undermine its position, pointing to Bradshaw's statement in his deposition, when asked whether he and Burcham did "any negotiation" of his salary: "No, not at the time. But yes there was because he was a coach and to bring him into this position, that was something he did discuss, saying that he needed to basically be compensated for the coaching that he was going to be losing."  (Bradshaw Dep. at 19:19–23.)  But at a minimum, Burcham's testimony that he didn't "negotiate," let alone make "specific demands" (as the School Board later described it in its EEOC position statement), calls into question a core aspect of the School Board's purported justification.  (*See* ECF No. 32-1, at 6.)

The School Board also attempts to mitigate the impact of this discrepancy by pointing out that Burcham referenced emails and/or phone calls that occurred prior to being offered the position, suggesting that Burcham may have negotiated based on his coaching stipend in these prior communications.  But in response to follow-up questions on this point at his deposition, Burcham clarified that during these prior discussions—of which he only had a

vague recollection—he had been asked what he did for contract pay.  In other words, Burcham

didn't raise the issue of his coaching stipend; RCPS did.  As Burcham described it, "[W]hen

asked, like, what I did for contract pay, it was teaching and coaching."  (Burcham Dep. at

20:10–12.)  The School Board, moreover, has not pointed to any specific emails memorializing

any discussions or negotiations, and the court could not find any in the record.  In sum, there

is a genuine issue of material fact as to whether Burcham negotiated at all, and thus whether

one of the School Board's primary rationales for the pay differential is truthful or accurate.

And contrary to the School Board's suggestions, Barnett has presented evidence that

she attempted to negotiate a higher salary, at least insofar as she, like Burcham, made Bradshaw

aware of the various components of her current teacher's salary, including stipends for chairing

the science department and regularly teaching online courses.  Barnett testified:

> Q:  So tell me about this phone call with Jim Bradshaw.  What did he say?
>
> A:  He called and said he'd like to offer me the supervisor of science position, and he told me that I would be making $58,000, and I don't remember the exact—something over $58,000.  I said, "Well, Jim, that's significantly less than I'm making now."  He said, "Oh, that's right, because you teach online courses."  I said, "Yes, and I teach summer school, and I'm a department chair."

(Barnett Dep. at 26:19–27:7.)  Although the School Board tries to dismiss this testimony as

"self-serving," the court must credit it for purposes of summary judgment.  *See Williams v.*

*Giant Food Inc.*, 370 F.3d 423, 432-33 (4th Cir. 2004) (holding that a plaintiff's "self-serving

opinion" cannot defeat summary judgment, but crediting plaintiff's testimony as to the

underlying facts of the case); *Lilly v. Crum*, No. 2:19cv189, 2020 WL 1879469, at * 4-5 (S.D.

W.Va. April 15, 2020) (relying on *Giant Foods* and crediting plaintiff's self-serving factual

testimony).  At bottom, Barnett's testimony that she, like Burcham, provided Bradshaw with a general breakdown of her current salary, further undermines a core tenant of the School Board's rationale that it awarded her male comparator the higher salary, in part, because of his superior negotiation skills.  From these facts, a reasonable jury could conclude that Barnett negotiated just as much as Burcham.  And, if the jury removed the negotiation from the School Board's combined negotiation-with-leverage rationale, a reasonable jury could find the School Board's proffered reason for the disparity is pretext for intentional discrimination.  *See Reeves*, 530 U.S. at 147 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a *prima facie* case, suffice to show intentional discrimination.").

As a final matter, the School Board suggests that even if Burcham is a proper comparator—and therefore that Barnett has established a *prima facie* case of discrimination— and assuming there is sufficient evidence upon which a jury could disbelieve the School Board's explanations for the pay disparity, that evidence still does not give rise to an inference of unlawful discrimination.[10]  Specifically, the School Board points to two additional pieces of evidence that it contends destroys any inference of discriminatory motive and militates summary judgment in its favor.  First, the School Board contends that the fact that Bradshaw

---

[10] Defendant makes this point in support of its argument that Barnett has failed to establish a *prima facie* case of discrimination under the first prong of the *McDonnell-Douglas* test.  But as other courts have noted, the fourth element of the *prima facie* case (under circumstances suggesting a discriminatory motive) is "closely intertwined" with the intentional-discrimination aspect of the pretext analysis, and these two issues may be considered together.  *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008);  s*ee also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 648 (4th Cir. 2002) ("The second thrust of Colleton's argument is that even if the jury could disbelieve Hiott's explanations, Dennis'[s] evidence—limited as it was to her *prima facie* case and facts tending to discredit those explanations—was still insufficient to support her ultimate burden of demonstrating discrimination.").

participated in the first round of interviews for the Supervisor of Science position and recommended Barnett as his top candidate "negates any possible inference" of unlawful discrimination when he later set her and Burcham's pay.  (Def.'s Reply Br. at 7.)  Second, the School Board points out that the current Supervisor of Art, Sara Cubberly (who is also a female), is permitted to teach online courses at the Burton Center, and that Cubberly, who only has 11 years of teaching experience, was awarded the same number of Steps as Burcham, undercutting "any argument Plaintiff could make that her treatment was based on her sex." (Def.'s Br. Supp. Mot. Summ. J. at 19.)

In support of this first argument—that the fact that Bradshaw recommended Barnett as his top candidate after the first round of interviews negates, as a matter of law, any inference of discrimination that may arise—the School Board cites two Fourth Circuit cases.  But they are factually inapposite to this case and do not support a determinative inference in favor of the School Board at the summary judgment stage.   In *Rodriguez v. Elon University*, an unpublished *per curiam* decision from 2018, the court held that a plaintiff seeking to establish a failure-to-promote claim under Title VII failed to establish an inference that he was rejected for the position because of his race.  751 F. App'x 395, 397 (2018).  Noting the dearth of evidence suggesting discriminatory intent in the first instance, the court reasoned that the fact that this same supervisor had initially recommended the plaintiff for tenure negated any possible inference of discrimination.  *See id.*  Barnett, unlike the plaintiff in *Rodriguez*, has cited abundant inconsistent and contradictory evidence that casts doubt on the School Board's proffered legitimate reasons for the pay disparity.   From this evidence a jury could find discriminatory intent.  The fact that Bradshaw recommended Barnett as a top candidate during

her interview process is too flimsy a fact, in light of the other evidence, to warrant granting summary judgment.

In *Evans v. Technologies Applications & Service Company*, the second case cited by the School Board, the court reasoned that, because the same supervisor who allegedly failed to promote the plaintiff because of her sex had previously hired her, there was a "powerful inference" that the failure to promote was not discriminatory. 80 F.3d 954, 959 (4th Cir. 1996). Critically, the court noted that this inference would arise under "ordinary principles of proof," where a plaintiff is relying on direct or circumstantial evidence, rather than the *McDonnell-Douglas* burden-shifting scheme, to establish intentional discrimination. *Id.* Barnett, however, is not proceeding under ordinary principles of proof, and she has satisfied her burden of production under *McDonnell-Douglas's* burden-shifting scheme.

Similarly, *Cook v. CSX Transportation Corp.*, the only Title VII case cited by the School Board in support of its argument that the court should draw a determinative inference in its favor based on Cubberly's higher salary and continued online teaching, does not compel this court to grant summary judgment in its favor. 988 F.2d 507 (4th Cir. 1993). *Cook* involved the "somewhat novel issue" of a plaintiff attempting to prove a prima facia case of "racially disparate discipline" by singling out "one prior instance of less severe treatment of a person outside the protected class[,]" while ignoring other instances where persons outside the protected class were treated more, or equally, severely. *See id.* at 508–09. The court rejected that approach, holding that focusing "on one piece of the record without considering the whole would distort the permissible inferences to be drawn." *Id.* at 512. *Cook* simply does not apply—at least not in the way Defendant claims. Barnett is pursuing a Title VII claim for

an unlawful pay disparity, not disparate discipline on the basis of sex.  As she is entitled to do under well-established law, Barnett seeks to prove a disparity in her pay—and therefore a *prima facie* case of discrimination—through a single comparator, Burcham.  The fact that the School Board may have paid someone else within her protected class more money, for whatever reason, does not, as a matter of law, destroy the genuine issue of material fact as to whether the School Board paid Barnett less than her comparator for unlawful reasons.

Of course, all of this is not to say that additional evidence related to Cubberly's salary and Bradshaw's initial ranking of Barnett would not be relevant at trial, or that a jury could not consider this evidence in deciding whether Barnett has met her burden of proving intentional discrimination.  This type of evidence—and reasonable inferences drawn from it—would almost certainly be fair game at trial.[11]  But at the summary-judgment stage, these additional facts and attendant inferences in favor of the School Board do not vitiate the genuine questions of material facts that Barnett, for the reasons explained above, has established to support her claim.  The issue—at this stage of the proceeding—is whether those additional facts permit the court to draw a determinative inference in Defendant's favor that its motives were not discriminatory.  On this record, and under applicable law, the court concludes that they do not, and it will therefore deny the motion for summary judgment.  *See Haynes*, 922 F.3d at 225 ("Once the plaintiff offers such circumstantial evidence, the case must be decided by the trier of fact and cannot be resolved on summary judgment.").

---

[11] Just as Barnett would be allowed to put on evidence that Bradshaw had virtually unfettered discretion in selecting pay-scale steps for RCPS applicants, including Barnett, and that a consultant recently hired by the School Board to complete a compensation study noted an "inconsistency in placement of employee salaries based on years of experience."  (*See* ECF No. 32-12, at 2.)

## IV.   CONCLUSION

For the above reasons, the court will deny the School Board's motion for summary judgment and the matter will proceed to trial.  The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 30th day of November, 2021.


_/s/ Thomas T. Cullen_
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE